## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:13-CV-522-D

| | |
|---|---|
| NATHAN P. ALLEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| CITY OF RALEIGH, | ) |
| | ) |
| Defendant. | ) |

Nathan P. Allen ("Allen" or "plaintiff") seeks relief from his former employer, the City of Raleigh ("City" or "defendant"), under the Americans with Disabilities Act (as amended), 42 U.S.C. §§ 12101–12213 ("ADA"). On March 4, 2014, the court dismissed four of Allen's claims but permitted his ADA failure-to-accommodate claim to proceed. See Allen v. City of Raleigh, No. 5:13-CV-522-D, 2014 WL 8450735, at *7 (E.D.N.C. Mar. 4, 2014) (unpublished). On January 22, 2015, the City moved for summary judgment on Allen's remaining claim and filed a memorandum in support. See [D.E. 27, 28]; Fed. R. Civ. P. 56. On March 6, 2015, Allen responded in opposition. See [D.E. 37]. On April 8, 2015, the City replied. See [D.E. 40]. As explained below, the court grants the City's motion for summary judgment.

I.

Allen is a graduate of North Carolina State University and a trained paralegal. Allen Dep. [D.E. 29] 10–11. Allen worked in the City's Public Utilities Department from April 1989 until he retired in November 2013. While a City employee, Allen held three titles: "Water Meter Reader," "Senior Meter Reader," and "Water Meter Mechanic." While playing softball on a City softball team in May 2000, Allen injured his left shoulder and received a 40% permanent partial disability ("PPD") rating concerning his left shoulder in his workers' compensation case. Id. 11–12. Although Allen's shoulder injury limited his ability to lift and perform manual tasks, it did not affect his ability to

perform his duties as a Water Meter Reader. Id. 11–15. After the injury, Allen never requested or received an accommodation as a Water Meter Reader. Id. In August 2011, the City promoted Allen to Senior Meter Reader. Id. 13. Again, Allen's shoulder condition did not impact his ability to perform his duties as a Senior Meter Reader, and Allen never requested or received an accommodation. See id. 13–15.

On December 4, 2012, the City reclassified Allen's position—along with the positions of the two other Senior Meter Readers—to Water Meter Mechanic. Ray Decl. [D.E. 27-1 ¶ 3–4; Conroy Decl. [D.E. 27-2] ¶ 3. On December 3, 2012, Karen Ray (the City Meter Superintendent) met with Allen and Jim Ockletree (another Senior Meter Reader) and told them that the City was reclassifying the three Senior Meter Reader positions to Water Meter Mechanic positions. Ray Decl. ¶¶ 5–6; Allen Dep. 25–26.[1]   Allen then told Ray that he had a 40% PPD due to an old workers' compensation case and that he needed to see his doctor to assess his ability to perform the duties of a Water Meter Mechanic. See Allen Dep. 25–26; Ray Decl. ¶¶ 5–6. Ray, who did not know about Allen's shoulder injury, PPD, or old workers' compensation case, did not object and told Allen that, while his title would change, his job duties would not change from the job duties that he was performing as a Senior Meter Reader. See Ray Decl. ¶ 6.

On December 4, 2012, Ray emailed Sandra Perry, a Registered Nurse in the City Employee Health Center, and Shawnda Brown, a City Human Resources employee, and said:

It just came to my attention that I have an employee with a 40% medical disability who has had it for years and will apparently for life. Apparently he has managed his duties through his supervisors and I was never aware of this until today. The reason why it is now a potential issue is because we are changing his title from Sr. Meter Reader to Water Meter Mechanic. Essentially his functions won't change, so we shouldn't have a problem, but I need to make sure our ducks are in a row. Could one of you look to see if you have any information on this and let me know what his restrictions are.

[D.E. 27-1] 14.

---

[1] Karen Ray used to be known as Karen Hanny. The court refers to her as Ray.

On December 4, 2012, Nurse Perry responded. She wrote: "I don't have any notes from a doctor regarding a disability. Is the disability from a workers' compensation claim?" [D.E. 27-1] 13.

In order to assist Allen's doctor to understand the physical requirements of a Water Meter Mechanic, which would involve the same duties that Allen was performing as a Senior Meter Reader, Ray completed a four-page City checklist form entitled "Physical Activities and Requirements Checklist Visual Acuity and Working Conditions." See Ray Decl. ¶ 7; City Dep. Ex. 3 [D.E. 30] 7–10. In completing the four-page City checklist form, Ray worked with Allen's immediate supervisor Darin DePaolo and Allen's next-level supervisor Lorenzo Holloway. See Ray Decl. ¶ 7; City Dep. Ex. 3. The four-page City checklist form listed the following physical activities for the Water Meter Mechanic position: stooping, kneeling, crouching, reaching, standing, walking, pushing, pulling, lifting, fingering, grasping, talking, and repetitive motions. See City Dep. Ex. 3. As for physical requirements, the form listed "Light Work," which the form described as:

> Exerting up to 20 pounds of force occasionally, and up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. If the use of arm and/or leg controls require exertion of forces greater than that for sedentary work, and the worker sits most of the time, the job is rated for light work.

Id.

On December 4, 2012, Ray gave the four-page City checklist form to Allen to give to his doctor. See Ray Decl. ¶ 7; Allen Dep. 30–32. Allen continued to work under the title Water Meter Mechanic, but he performed the same duties that he had performed since August 2011 as a Senior Meter Reader. See Allen Dep. 30–41.

On December 4, 2012, Ray also contacted Rebecca Martin in the City's Risk Management Division, which handles the City's workers' compensation claims. See Ray Decl. ¶ 8. Ray learned from Martin that Allen had a 40% PPD for his left shoulder. See Ray Decl. ¶ 8 & Ex. 1. According to the November 2001 document in the City's file from Allen's doctor, Dr. Speer, Allen was limited to checking 150–200 meters a day with an average of 175. See id. Allen's duties as a Senior Meter

3

Reader were well within this limitation in that Allen typically checked 15–25 meters per day. See Ray Decl. ¶ 8.

After Allen received the four-page City checklist form from Ray, Allen made an appointment with Dr. Speer for December 18, 2012. Dr. Speer had treated Allen since 2000. See Speer Dep. [D.E. 31] 6–7. Dr. Speer performed surgery on Allen's left shoulder in November 2000 and assigned him a 40% PPD under North Carolina Industrial Guidelines in connection with Allen's workers' compensation case. See id. 7–8. In approximately 2006, Dr. Speer told Allen not to lift more than 25 pounds. See id. 8. Dr. Speer examined Allen on December 18, 2012. See id. 8–9. During that visit, Dr. Speer reviewed the four-page City checklist form that Allen gave to him and "thought it was acceptable so [he] signed it designating [his] acceptance." Id. 10; City Dep. Ex. 3. The four-page City checklist form stated that Allen would perform "Light Work" and occasionally need to exert up to 20 pounds of force, and Dr. Speer believed that Allen could do that. See City Dep. Ex. 3; Speer Dep. 9–10, 20–21.

On December 19, 2012, Allen told Ray that his doctor okayed the physical activities in the four-page City checklist form. See Allen Dep. 36; Ray Decl. ¶ 9. Ray, in turn, advised Sandra Perry in the City Employee's Health Center and Shawnda Brown in Human Resources that Allen's doctor had cleared him to perform the activities in the four-page City checklist form. See Ray Decl. ¶ 9 & Ex. 2.

After Ray learned from Allen on December 19, 2012, that Dr. Speer had approved his ability to perform the activities in the four-page City checklist form and having checked with the Risk Management Division about any other limitations, Ray concluded that Allen could continue to perform the essential functions of Senior Meter Reader even though his job title was now Water Meter Mechanic. See Ray Decl. ¶ 9. At this point, on December 19, 2012, Ray believed that she had addressed Allen's concerns. Ray also believed that Allen understood that although he was working under the title Water Meter Mechanic, he would simply continue to perform the same duties

4

that he had performed as a Senior Meter Reader. Id. Furthermore, Ray believed (based on what Allen told her) that Allen's doctor had approved Allen performing the duties. See id. ¶¶ 9–10. As Allen had done since December 4, 2012, Allen continued to work under the title Water Meter Mechanic but performed the duties of a Senior Meter Reader. See id.; Allen Dep. 56.

After Allen told Ray on December 19, 2012, that his doctor had approved Allen working in accordance with the four-page City checklist form, Allen gave the four-page City checklist form that Dr. Speer signed to Sandra Perry in the Employee Health Center. See Allen Dep. 37–39. According to Allen, Perry told Allen that he had been given the wrong form in light of his workers' compensation case. See id. 39. Soon thereafter, Allen spoke with a City employee named Precious in the Risk Management Division. Id. 41. According to Allen, Precious told Allen that he had received the wrong form to give to his doctor but that she would follow up on the issue. Id. 42–43. Allen did not relay this information to anyone, including Ray or his immediate supervisor DePaolo. Id. 43; see id. 46.

On January 3, 2013, Allen received a phone call from Dr. Speer's office. Id. 48. Dr. Speer's office told Allen that it had received some new documentation from the City regarding the Water Meter Mechanic position. See id. 49. The new documentation was a "Workers Compensation Medical Status Questionnaire" form and a two-page job description for the Water Meter Mechanic job. See id.; City Dep. Ex. 2 [D.E. 30] 4–6. Dr. Speer's office told Allen that the job description stated that Allen would have to frequently lift or move 100 pounds and that Dr. Speer could not approve Allen frequently lifting or moving 100 pounds due to Allen's shoulder injury. See Allen Dep. 49–52.

Dr. Speer testified that, on January 3, 2013, he completed and signed the "Workers' Compensation Medical Status Questionnaire" form. On the form, Dr. Speer checked "NO" in response to the question "At this time given the patient's history or condition, is the patient able to return to his/her job as provided in the attached job description." Speer Dep. 10–11; 20–21; City

5

Dep. Ex. 2. Attached to the "Workers' Compensation Medical Status Questionnaire" form was a two-page job description for the Water Meter Mechanic position. See City Dep. Ex. 2. On the job description, someone circled a portion of the sentence stating, "The employee must frequently lift and/or move up to 100 pounds." City Dep. Ex. 2. Dr. Speer explained that he checked "NO" on the Workers' Compensation Medical Status Questionnaire form due to the 100-pound lifting requirement on the second page of the Water Meter Mechanic job description. See Speer Dep. 20–21.

After Allen spoke with his doctor's office on January 3, 2013, Allen was concerned and decided to speak with a friend to advise him on whether to retain an attorney. See Allen Dep. 52. Before meeting with his friend, Allen phoned Dr. Speer's office and asked Dr. Speer's office to send a copy of the "Workers' Compensation Medical Status Questionnaire" form and the two-page job description referenced in the conversation of January 3, 2013. See id. 53; City Dep. Ex. 2. Dr. Speer's office mailed the two documents to Allen. See Allen Dep. 53.

Upon receiving the two documents, Allen was concerned that the form stated that he was not able to return to work "as provided in the attached job description." City Dep. Ex. 2; Allen Dep. 53–54. However, Allen also knew that since December 4, 2012, he had been working under the title Water Meter Mechanic but had been performing the duties of a Senior Meter Reader and that he did not need any accommodation to perform the duties of a Senior Meter Reader. Instead of speaking with Ray or DePaolo or anyone else in the City about his concerns that Dr. Speer approved the tasks identified in the four-page City checklist form in December 2013, but disapproved the job description in the Workers' Compensation Medical Status Questionnaire form on January 3, 2013, Allen decided to retain an attorney. See id. 53–55. Allen spoke with three or four attorneys during January and February. Id.

Allen retained an attorney on February 19, 2013. See id. In accordance with his attorney's advice, Allen filed an EEOC charge on February 22, 2013. See Allen Dep. 55–56; City Dep. Ex. 4

6

[D.E. 30] 11. From December 4, 2012, through February 22, 2013, Allen continued to perform without incident the duties of Senior Meter Reader while having the title Water Meter Mechanic. Allen Dep. 55–56.

In Allen's EEOC charge, Allen alleged retaliation, age discrimination, and disability discrimination:

> I. I have worked for the Respondent since April 26, 1989. In 2000, I had an on the job injury that left me disabled. I held the position of Senior Meter Reader until Dec. 4, 2012, when three employees in the position were reclassified. As a result of this reclassification, however, due to the change in duties, the job description was reviewed by my physician and it was determined that I could not perform the essential duties of the reclassified position and there is no accommodation that will allow me to perform those duties. My job title has changed; however, to date, the Respondent has allowed me to perform my former duties and no action has been taken against me . . . .
>
> II. The Respondent has asked me to perform duties that are outside of my restriction, but because I had not had an opportunity to speak with my attorney, did not have the tools to perform the task, and because these were duties that I had not been previously performing, I did not perform the duty and no action was taken against me. I have also been advised by the Commission to review any advertised vacant jobs to determine if there are any that I am qualified for that I can perform the essential functions of, with or without an accommodation. My attorney instructed me to file this charge so we can pursue this matter in court.
>
> III. I feel that I have been discriminated against due to my disability in violation of the American's with Disabilities Act, of 1990 as amended. . . .

City Dep. Ex. 4.

In March 2013, the EEOC notified the City of Allen's EEOC charge. When Ray learned of Allen's EEOC charge, she was surprised. See Ray Decl. ¶ 10. After all, Ray had told Allen at their meeting on December 3, 2012, that he would not have to perform all of the duties of a Water Meter Mechanic. Rather, Allen would have that title but continue to perform the duties of a Senior Meter Reader. See Allen Dep. 38, 56, 104. Furthermore, from December 4, 2012, through the date that Ray learned about Allen's EEOC charge, Allen had performed the duties of Senior Meter Reader

without incident, even though his title was now Water Meter Mechanic.[2] Moreover, throughout that time period, Allen never expressed any concerns to Ray or his supervisors about his job or his duties. See DePaolo Decl. [D.E. 42] ¶ 2. Nonetheless, in his EEOC charge, Allen alleged that his physician had reviewed the job description for a Water Meter Mechanic and stated that Allen could not perform the essential duties of Water Meter Mechanic. See Ray Decl. ¶ 11. Allen also stated in the EEOC charge that "there is no accommodation that will allow [Allen] to perform [the] duties of a Water Meter Mechanic." City Dep. Ex. 4.

The City investigated the EEOC charge. See Ray Decl. ¶ 10. As part of the investigation, Ray contacted the Employee Health Center in order to determine whether it had received any new documentation from Allen or Allen's physician. See Ray Decl. ¶¶ 13–14. The Employee Health Center had not. See id. Ray also contacted Shawnda Brown in Human Resources to see whether Allen had submitted a grievance or any additional information to Human Resources concerning his job or anything else. See Ray Decl. ¶ 14. Allen had not. Id. Ray also knew that Allen had not contacted her or his immediate supervisor DePaolo or next-level supervisor Holloway to discuss any concerns about his job. See id. ¶ 14.

On March 27, 2013, Ray met with Allen and asked him about their conversation on December 19, 2012, when Allen had told Ray that Allen's doctor had approved Allen continuing to work as outlined in the four-page City checklist form and asked Allen to whom he had submitted the approval of the four-page City checklist form from his doctor. See Ray Decl. ¶ 15; cf. City Dep. Ex. 3. Allen told Ray that, upon advice of counsel, he could not communicate with Ray. See Ray Decl. ¶ 15. Indeed, unbeknownst to Ray, Allen secretly recorded the meeting, and the transcript confirms that Ray asked Allen to whom in the City Allen submitted the doctor's paperwork. See City Dep. Ex. 5 [D.E. 30] 12–15. Allen told Ray that she needed to contact his attorney. Id. 13–14.

---

[2] On one occasion between December 4, 2012, and February 22, 2013, Allen's supervisor asked him if he wanted to earn some extra overtime. See Allen Dep. 101—02. Allen decided that he did not want to do the work and declined. Id. No repercussions ensued. Id.

8

On March 28, 2013, Ray arranged a meeting among Ray, Darin DePaolo (Allen's immediate supervisor), and Allen. See Ray Decl. ¶ 16; City Dep. Ex. 6 [D.E. 30] 16–21 (transcript of meeting). Again, unbeknownst to Ray, Allen secretly recorded the meeting. See Ray Decl. ¶ 16; City Dep. Ex. 6. During the meeting, Ray gave Allen a four-page City checklist form entitled "Physical Activities and Requirements Checklist, Visual Activity and Working Conditions" concerning the Water Meter Mechanic position. See Ray Decl. ¶ 16; City Dep. Ex. 7 [D.E. 30] 22–28. Unlike the four-page City checklist form that Ray had given Allen on December 4, 2012, and that Allen had given Dr. Speer to review and that Dr. Speer had approved on December 18, 2012, the four-page City checklist form that Ray gave Allen had a check next to "Very Heavy Work" instead of next to "Light Work." Compare City Dep. Ex. 7 [D.E. 30] 27, with City Dep. Ex. 3 [D.E. 30] 8. Ray also gave Allen a job description for the Water Meter Mechanic position. See Ray Decl. ¶ 16; City Dep. Ex. 7. Ray attached these documents to a memorandum dated March 28, 2013, intended for Allen's physician. As described in the memorandum, the City wanted Allen's physician to describe Allen's date of onset of condition(s), the prognosis for the condition(s), and limitations, if any, in order for the City to undertake the accommodation process. See Ray Decl. ¶ 16; City Dep. Ex. 7; Allen Dep. 80. At the meeting on March 28, 2013, Ray asked Allen to submit the completed documents to the City Employee Health Center by April 10, 2013. See Ray Decl. ¶ 16. Ray also explained why the City needed the documents as part of the accommodation process. See Ray Decl. ¶ 17; City Dep. Ex. 6.

Allen gave the documents that he received at the meeting on March 28, 2013, to his lawyer. Allen Dep. 88. Allen did not give the documents to Dr. Speer or any other physician. See id. Allen never responded to the City's March 28, 2013 request for accommodation information. See id. 84–85. Instead, on April 9, 2013, Allen's lawyer submitted to the City Employee Health Center the "Workers' Compensation Medical Status Questionnaire" form that Dr. Speer completed on January 3, 2013, and the two-page job description. See Ray Decl. ¶ 18; City Dep. Ex. 8 [D.E. 30] 29–32; Allen Dep. 89–93. The form stated that Allen was not able to return to his job as a Water Meter

Mechanic, but the form did not provide the information requested in the March 28, 2013 memorandum concerning the onset of Allen's condition(s), the prognosis, and any specifics regarding his limitations to perform his job or any other job. See City Dep. Ex. 8; City Dep. Ex. 2; Ray Decl. ¶ 18; Allen Dep. 87.

Allen knew that his attorney would be submitting the "Workers' Compensation Medical Status Questionnaire" form and the two-page job description on April 9, 2013, and he also knew that the documentation (1) did not state what Allen's disability was; (2) did not state how severe Allen's disability was; and (3) did not state how long that Allen had the disability. See Allen Dep. 90–91. Allen also knew that the documentation did not describe the extent of his disability or how his disability limited his ability to perform any activity, including any activity concerning work. Id. Allen also knew that the documentation did not request or identify any accommodation. Id.

The City's normal policy when presented with a physician statement that an employee cannot return to work is to send the employee home until the employee's physician clears the employee to return to work with or without restrictions. Ray Decl. ¶ 19. Nonetheless, in Allen's case, the documentation that Allen's lawyer submitted on April 9, 2013, indicated that Allen could not return to work as a Water Meter Mechanic. Allen, however, actually had been performing only the duties of a Senior Meter Reader from December 4, 2012, through April 9, 2012. See Ray Decl. ¶ 19. Thus, the City thought it reasonable to allow Allen to continue to work in that accommodated way (as he had been doing since December 4, 2012) so long as Allen stated in writing that he could continue to perform the duties of Senior Meter Reader outlined in the four-page City checklist form that he received in December 2012, and that Dr. Speer had approved. See id.

On April 10, 2013, Ray requested another meeting with Allen. See Ray Decl. ¶ 20. Allen declined the meeting via email and stated that his lawyer told him to communicate with Ray only through his lawyer or with his lawyer present. See id.; City Dep. Ex. 10 [D.E. 30] 34–35; Allen Dep. 96–97.

On April 11, 2013, Ray responded via email to Allen's email. Ray Decl. ¶ 21. Ray told Allen that they needed to meet to discuss additional accommodation paperwork that the City needed as part of the accommodation process, and Ray attached accommodation paperwork that the City needed Allen to complete and return. See id.; City Dep. Ex. 10. Ray also told Allen that it is not the City's policy to have an employee's attorney at meetings concerning internal employment matters. City Dep. Ex. 10. Ray also said that "it is imperative for us to have an open dialogue with you in order to follow the legally required interactive process necessary to evaluate a reasonable accommodation request." Id. Ray also told Allen that the City had the Workers' Compensation Medical Status Questionnaire form from Allen's physician dated January 3, 2013, stating that Allen could not perform the duties of a Water Meter Mechanic, but the form failed to address Allen's ability to perform the essential functions of the Senior Meter Reader position in the four-page City checklist form that he received in December 2012. Id. Thus, Ray told Allen that he would need to take paid leave until he confirmed in writing that he could perform the duties that he had been performing in accordance with the accommodation that he had received since December 4, 2012 (i.e., perform the duties of a Senior Meter Reader while having the title Water Meter Mechanic). See id.; Ray Decl. ¶ 22; Allen Dep. 38, 55, 104.

On April 11, 2013, Ray, Allen, and Lorenzo Holloway (Allen's supervisor above DePaolo but below Ray) met. See Ray Decl. ¶ 23. Again, unbeknownst to Ray, Allen secretly recorded the meeting. See City Dep. Ex. 12 [D.E. 30] 45–53. At the meeting, Ray confirmed what she wrote in her April 11, 2013 email. Ray told Allen that the January 3, 2013 Workers' Compensation Medical Status Questionnaire form from Allen's physician simply said that he could not perform as a Water Meter Mechanic but did not say what Allen could do, including whether Allen could continue to perform the duties of a Senior Meter Reader, which he had been doing since December 4, 2012. See Ray Decl. ¶ 24; City Dep. Ex. 12. Ray again gave Allen the accommodation paperwork that the City needed Allen to complete and return in order for the accommodation process to proceed. See Ray

11

Decl. ¶ 24; City Dep. Ex. 11 [D.E. 30] 36–44. Ray also reiterated to Allen that unless he confirmed "in writing that [he was] able to perform [his] job with the accommodations that we have made for you over the last few months, then you are going to have to take leave effective immediately until the attached medical forms are completed and returned." City Dep. Ex. 10; see Ray Decl. ¶¶ 23–24; City Dep. Ex. 12; Allen Dep. 98–99.

The accommodation paperwork that Ray provided to Allen via email and in person on April 11, 2013, explained in great detail the accommodation process that the City and its employees were to follow under the ADA. See City Dep. Ex. 11. The paperwork included a sheet summarizing the ADA accommodation process, a four-page City checklist form concerning the job, a "Release of Medical Information" form, a "City of Raleigh Return to Work Release" form, and a "Medical Injury Form in Response to and Accommodation Request." Id. The paperwork instructed Allen to take the forms to his health-care provider, have the health-care provider review and complete the forms, and return the completed forms to the City's Employee Health Center so that the accommodation process could occur. See id. The accommodation paperwork stated that if the health-care provider had any questions, the health-care provider should contact Sandra Perry, the Nurse Supervisor, and provided Nurse Perry's contact information. See id.

After the meeting on April 11, 2013, Allen did not provide the City with anything in writing stating that he could continue to perform the duties of a Senior Meter Reader as outlined in the four-page City checklist form that Dr. Speer approved on December 18, 2012. Allen also never responded to the City's request for accommodation information in the documents that Allen received via email and in person on April 11, 2013. Ray Dec. ¶ 25; see Allen Dep. 83–93, 97–99, 120–22. Instead, Allen took leave. See Ray Decl. ¶ 25; Allen Dep. 98, 119. Specifically, Allen took a combination of sick leave, vacation, FMLA leave, and City-Manager approved special leave. See Ray Decl. ¶ 25. Initially, Allen's leave was paid and later some was unpaid. See id.

On June 21, 2013, Allen filed suit against the City in state court, alleging failure to

12

accommodate, disability discrimination, and unlawful retaliation under the ADA, age discrimination under the Age Discrimination in Employment Act, and intentional infliction of emotional distress under North Carolina law. Compl. [D.E. 1-1] ¶¶ 58–110. The City timely removed the action to this court. See [D.E. 1].

On July 16, 2013, Ray sent Allen a copy of the same accommodation paperwork that she emailed and gave Allen on April 11, 2013, and told Allen that he needed to submit the completed paperwork in order to complete the accommodation process so that he could return to work. See Ray Decl. ¶ 25; City Dep. Ex. 13 [D.E. 30] 54–63. Allen never returned the accommodation paperwork. See Allen Dep. 83–93, 97–99, 120–22, 144–48.

On September 16, 2013, Ray sent Allen another letter concerning his leave status and need to request additional leave if he planned to continue to remain on leave. In the letter, Ray again referenced the accommodation paperwork that the City had given Allen in April and July 2013 but that Allen had not returned. See Ray Decl. ¶ 25; City Dep. Ex. 15 [D.E. 30] 68–71. Allen remained on leave until he retired on November 1, 2013. See Ray Decl. ¶ 25.

Allen never submitted the requested accommodation paperwork that the City emailed and gave him on April 11, 2013, mailed to him on July 16, 2013, and referenced by letter on September 16, 2013. See Allen Dep. 83–93, 97–99, 120–22, 144–48. Allen admits that the City never required him to preform the duties outlined in the Water Meter Mechanic job description and that from December 4, 2012, until he went on leave on April 10, 2013, he performed only the duties of Senior Meter Reader. See Allen Dep. 101, 105. Allen also admits that his doctor never told him that he could not perform the duties of Senior Meter Reader. Id. 105.

During discovery, Allen provided the City with copies of three documents that Dr. Speer completed concerning Allen's workers' compensation case. One document was dated October 3, 2006, another was dated January 13, 2011, and another had an illegible date. See Allen Dep. 17–22; City Dep. Ex. 1 [D.E. 30] 1–3.

13

During discovery, the City obtained a portion of Dr. Speer's medical records concerning Allen. Dr. Speer's medical records concerning Allen had the three workers' compensation documents referenced above, plus five similar workers' compensation documents. See Speer Dep. 12; City Dep. Ex. 1 [D.E. 30] 1–3; City Dep. Ex. 20 [D.E. 32] 22–29. One of the documents is undated. Id. 22. The other documents are dated April 16, 2003, June 30, 2004, July 5, 2005, October 3, 2006, November 20, 2007, August 11, 2009, and January 13, 2011. See id. 20–29.

Dr. Speer testified that the eight documents are workers' compensation forms on which Dr. Speer wrote the "degree of disability, timing of work return, capacity of returning to regular job, capacity of returning to full- or part-time" and indicated restrictions. See Speer Dep. 12–13. On all but one of the forms (the one dated April 16, 2003, in which Dr. Speer marked no disability), Dr. Speer circled "partial" with respect to the degree of Allen's disability. See City Dep. Ex. 20. Two out of the eight forms (one dated October 3, 2006, and another dated November 20, 2007) have the lift/carrying restriction box checked and indicate a 25-pound lift/carrying restriction as well as restrictions on climbing ladders and stairs. See id.; Speer Dep. 15–16. The same two forms from 2006 and 2007 indicate that Allen should not examine more than 150–200 meters per day. See id.

Darin DePaolo, Allen's immediate supervisor from May 24, 2010, until Allen retired, testified that Allen's employment file does not contain any of the eight forms in Dr. Speer's file and that Allen never gave any such forms to him. See DePaolo Decl. ¶¶ 2–3. Allen testified that it was his habit to get these forms from Dr. Speer and to give them to his supervisor. See Allen Dep. 20–22.

The last time that Dr. Speer spoke with Allen was on December 18, 2012, during Allen's office visit. Speer Dep. 10–12. Dr. Speer never received a copy of the accommodation documents given to Allen on March 28, 2013, twice given to Allen on April 11, 2013, and again given to Allen on July 16, 2013. See id. 17–19. Furthermore, Dr. Speer never spoke with anyone from the City concerning Allen's physical condition or anything else (including any accommodation) and would

14

not do so absent Allen's permission. See id. 18–19. Allen never gave such permission to Dr. Speer and never asked Dr. Speer to speak with the City about Allen's disability or how to accommodate it. See id. 19.

Allen admits that he and his attorney never provided the March, April, or July 2013 accommodation paperwork to Dr. Speer or to any other physician. See Allen Dep. 83–89, 120–22, 144–48. Likewise, Allen admits that he never responded to the City's request for accommodation documents reflected in the documents he received on March 28, 2013, twice received on April 11, 2013, again received on July 16, 2013, and that the City referenced by letter on September 16, 2013. See Allen Dep. 84–88, 90–93, 120–23, 144–48.

II.

In considering the City's motion for summary judgment, the court views the evidence in the light most favorable to Allen and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially come forward and demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving

15

party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

Under the ADA, a covered employer may not discriminate "against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). A "disability" may take the following forms: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such impairment"; or (3) "being regarded as having such an impairment." Id. § 12102(1); see Summers v. Altarum Inst. Corp., 740 F.3d 325, 328–29 (4th Cir. 2014). Allen contends that his shoulder condition constitutes an actual physical impairment that substantially limits him in the major life activities of lifting and performing manual tasks.

Under the ADA, a "qualified individual" is an "individual who, with or without reasonable accommodation, can perform the essential position that such person holds or desires." 42 U.S.C. § 12112(a). "The qualified individual criterion and the reasonable accommodation requirement are interrelated." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012) (quotations omitted). The determination regarding whether an individual is a "qualified individual" is made at "the time of the employment decision." Ross v. Indianan St. Teacher's Ass'n Ins. Trust, 159 F.3d 1001, 1013 (7th Cir. 1998). "Being qualified is determined in relation to the essential functions of the job, and reasonable accommodation by the employer does not require the elimination of an essential function of the job." Jones, 696 F.3d at 88 (quotation omitted). Likewise, an employer is not required to create a new job (or recreate an old job) to enable an employee with a disability to work. See, e.g., Mulloy v. Acushnet Co., 460 F.3d 141, 153–54 (1st Cir. 2006); Graves v. Finch Pruyn & Co. Inc., 457 F.3d 181, 186–87 (2d Cir. 2006); Lamb v. Qualex, Inc., 33 F. App'x 49, 59 (4th Cir. 2002) (unpublished); Smith v. Midland Brake, Inc., 180 F.3d 1154, 1174 (8th Cir. 1999) (en banc) (collecting cases from the Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and D.C.

16

Circuits); Shirling v. Runyon, 90 F.3d 827, 831–32 (3d Cir. 1996).

Under the ADA, "[a]n essential function is a fundamental job duty of the position at issue. The term does not include marginal tasks, but may encompass individual or idiosyncratic characteristics of the job." Jones, 696 F.3d at 88 (quotations omitted). "[C]onsideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written job description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). In analyzing a job's essential functions, courts consider not only the employer's judgment and written job description but also the work experience of past incumbents of the job and current work experience of incumbents of the job and similar jobs. See Jones, 696 F.3d at 88; 29 C.F.R. § 1630.2(n).

Under the ADA, unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee . . . ." 42 U.S.C. § 12112(b)(5)(A). "[R]easonable accommodation[s]" may include "job restructuring [or] reassignment to a vacant position . . . ." Id. § 12111(9)(B).

Central to most ADA failure-to-accommodate claims is whether, with a reasonable accommodation, an employee with a disability can perform the essential functions of a given job. See, e.g., Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 579–80 (4th Cir. 2015). The failure-to-accommodate inquiry generally proceeds in two steps: (1) was the specific accommodation that the disabled employee requested reasonable? and (2) if the employer granted the reasonable accommodation, could the disabled employee perform the essential functions of the job? See id. at 580–81. However, before addressing these two questions, especially in a case involving an alleged physical disability, the employer and the employee need to understand clearly the employee's specific, physical limitations in order to permit the employer and employee to assess

17

Case 5:13-cv-00522-D  Document 50  Filed 09/23/15  Page 17 of 30

any proposed accommodation. After all, a reasonable accommodation "is connected to what the employer knows about the specific limitations affecting an employee who is a qualified individual with a disability." Jackson v. City of Chi., 414 F.3d 806, 813 (7th Cir. 2005) (emphasis added); see 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" under the ADA to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . .") (emphasis added); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) (the ADA's statutory term "reasonable accommodation" is limited by the employer's knowledge of the disability). Accordingly, the ADA contemplates an open, interactive process between the employer and employee to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome the limitations." 29 C.F.R. § 1630.2(o)(3); EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132–33 (1st Cir. 2014); Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346–47 (4th Cir. 2013); Cloe v. City of Indianapolis, 712 F.3d 1171, 1178–79 (7th Cir. 2013); Hoppe v. Lewis Univ., 692 F.3d 833, 840–41 (7th Cir. 2012); Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011); EEOC v. Agro Distribution, LLC, 555 F.3d 462, 471–72 (5th Cir. 2009); Conneen v MBNA Am. Bank, N.A., 334 F.3d 318, 329–34 (3d Cir. 2003); Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 734–36 (5th Cir. 1999); Ross, 159 F.3d at 1013–15; Steffes v. Stepan Co., 144 F.3d 1070, 1072–73 (7th Cir. 1998); Beck, 75 F.3d at 1134–37.

A court reviewing an ADA failure-to-accommodate claim must review carefully the interactive process. See, e.g., Hoppe, 692 F.3d at 840. "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Kohl's Dep't Stores, Inc., 774 F.3d at 132. The interactive process requires bilateral cooperation, open communication, and good faith. Id. "If an employer engages in the interactive process with the employee in good faith, for the purpose of discussing alternative reasonable accommodations,

18

but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations." Id.; see Agro Distribution, LLC, 555 F.3d at 472; Jackson, 414 F.3d at 813–114; Loulseged, 178 F.3d at 738–40; Ross, 159 F.3d at 1014–15; Steffes, 144 F.3d at 1072– 73; Beck, 75 F.3d at 1134–36.

To establish a prima facie case in an ADA failure-to-accommodate claim, a plaintiff must prove: (1) he has a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) with a reasonable accommodation, he could perform the essential functions of the position; and (4) the employer refused to make such an accommodation. See, e.g., Wilson, 717 F.3d at 345. A plaintiff's failure to prove any element of his prima facie case defeats his ADA failure-to-accommodate claim. See id.; see also Kohl's Dep't Stores, Inc., 774 F.3d at 131.

The City argues that Allen failed to raise a genuine issue of material fact concerning each requirement of his ADA reasonable-accommodation claim. As part of its argument, the City also contends that, as a matter of law, Allen failed to engage in good faith in the interactive process, and that his failure to act in good faith prevented the City from determining the precise limitations resulting from his physical disability and the potential reasonable accommodations that could overcome those limitations. Thus, the City seeks summary judgment.

As for whether Allen has a "disability" under the ADA, the City argues that Allen has not raised a genuine issue of material fact concerning the issue. Allen responds that his shoulder condition substantially limits him in the major life activities of lifting and performing manual tasks.

The court need not resolve the issue. Instead, the court assumes without deciding that Allen's shoulder condition substantially limits him in the major life activity of lifting and performing manual tasks. See, e.g., Summers, 740 F.3d at 328–30.

Next, the City argues that it had no notice of Allen's alleged disability under the ADA. Viewing the record in the light most favorable to Allen, the City had notice of Allen's shoulder condition, including a 25-pound lifting restriction in 2006 and 2007, and had notice that Dr. Speer

19

did not want him to lift more than 100 pounds in 2013. See City Dep. Ex. 1; Speer Dep. 11–17; City Dep. Ex. 8; City Dep. Ex. 20. Moreover, the court assumes without deciding that the City had notice that Allen's shoulder condition in 2013 constituted a disability.

As for whether Allen could perform the essential functions of the Water Meter Mechanic position with reasonable accommodation, Allen never told the City before he filed suit in June 2013 what reasonable accommodation he desired. Rather, he waited until he filed suit. Specifically, in his complaint, Allen alleged that the City had to provide him with one of three reasonable accommodations: (1) permanent assignment to "Senior Meter Reader," including working under that job title and not the title "Water Meter Mechanic," (2) restating the essential job functions of a Water Meter Mechanic, or (3) offering Allen a different position with the City. See Compl. ¶¶ 63–64. The City responds, inter alia, that Allen's failure to engage in the interactive process in good faith prevented the City from determining the precise limitations arising from Allen's physical disability and proposing a reasonable accommodation to overcome those limitations.

As for Allen's suggestion that the City had to recreate his old job of Senior Meter Reader and allow him to work under that old job title, the City eliminated the position of Senior Meter Reader on December 4, 2012. See Conroy Decl. ¶ 3. Although a reasonable accommodation under the ADA may include "reassignment to a vacant position" (42 U.S.C. § 12111(9)(B)), the ADA does not require an employer to create a new position (or recreate an old one) as a reasonable accommodation. See, e.g., Mulloy, 460 F.3d at 153–54; Graves, 457 F.3d at 186–87; Lamb, 33 F. App'x at 59; Smith, 180 F.3d at 1174 (collecting cases from the Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits); Shirling, 90 F.3d at 831–32. Thus, the ADA did not require the City to create (or recreate) a Senior Meter Reader position and assign Allen to it.

As for restating the essential job functions of the Water Meter Mechanic position or offering Allen a different vacant position with the City, Allen never specified the precise physical limitations arising from his shoulder condition, described exactly how he wanted the City to restate the essential

20

Case 5:13-cv-00522-D   Document 50   Filed 09/23/15   Page 20 of 30

job functions of Water Meter Mechanic, or identified a specific vacant position with the City that was open and for which Allen was qualified. More importantly, Allen's proposed accommodations implicate the interactive process between Allen and the City. See 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.") (emphasis added).

"The duty to engage in the interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." Wilson, 717 F3d. at 346–47. "[T]he interactive process is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." Id. at 347 (quotation omitted). The Fourth Circuit (like all the other federal circuits to address the issue) has emphasized:

> [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011) (unpublished) (citation omitted) (emphasis added); accord Kohl's Dep't Stores, Inc., 774 F.3d at 132–34; Hoppe, 692 F.3d at 840–41; Griffin, 661 F.3d at 224–25; Agro Distribution, LLC, 555 F.3d at 471–72; Jackson, 414 F.3d at 813–14; Loulseged, 178 F.3d at 734–40; Ross, 159 F.3d at 1013–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1134–37.

During "the interactive process, an employer may request and require that the employee provide sufficient medical documentation." Gilreath v. Cumberland Cty. Bd. of Educ., No, 5:11-CV-627-BR, 2014 WL 3779090, at *8 (E.D.N.C. July 31, 2014) (unpublished). Such medical documentation allows the employer to determine the precise nature and extent of the employee's restriction due to a disability under the ADA and to assess potential reasonable accommodations. See id.; Williams v. Revco Disc. Drug Ctrs., 552 F. App'x 919, 922 (11th Cir. 2014) (per curiam) (unpublished); Hoppe, 692 F.3d at 839–41; Griffin, 661 F.3d at 225; Jackson, 414 F.3d at 814; Ross, 159 F.3d at 1014–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1136–37.

During the interactive process, medical documentation "is sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed." EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act. Question No. 10 (July 27, 2000), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html (last visited Sept. 22, 2015).

As discussed, Ray believed that the 40% PPD issue that Allen raised on December 3, 2012, was resolved on December 19, 2012. Specifically, Ray believed that Allen understood that although his title would be changing to Water Meter Mechanic, his job duties would not. See Ray Decl. ¶ 6. Nonetheless, because Allen expressed a desire on December 3, 2012, to consult with his physician, the City provided Allen the four-page City checklist form for Allen's physician to review. See id. ¶¶ 6–7; City Dep. Ex. 3. After Dr. Speer examined Allen on December 18, 2012, Allen told Ray on December 19, 2012, that his doctor okayed the physical activities on the four-page City checklist form. See Ray Decl. ¶ 9. Ray, in turn, advised the Employee Health Center and Human Resources. See id. Ex. 2. Beginning on December 4, 2012, Allen continued to work as accommodated under the title Water Meter Mechanic but performed the duties of a Senior Meter Reader, and Ray believed

22

that Allen's issue had been resolved.

Unbeknownst to the City, Allen became concerned about his job on January 3, 2013, when Allen received a call from Dr. Speer's office informing Allen that Dr. Speer could not approve him performing all of the duties outlined in the Water Meter Mechanic job description. Instead of bringing this concern to Ray's attention or to his supervisor's attention, Allen retained a lawyer. The lawyer then failed to bring the issue to the City's attention. Moreover, throughout January and February 2013, Allen continued to work without incident, as accommodated on December 4, 2012.

On February 22, 2013, Allen filed his EEOC charge. See City Dep. Ex. 4. In Allen's EEOC charge, Allen swore that there was no accommodation that would allow him to perform the essential functions of a Water Meter Mechanic. See id.

On March 8, 2013, unbeknownst to the City, Allen's attorney wrote to the EEOC. See Allen Dep. 153–55; City Dep. Ex. 16 [D.E. 30] 72. Allens' attorney asked the EEOC to cease its investigation (and thereby thwart any effort at conciliation) and instead to issue Allen a Right to Sue Notice. See City Dep. Ex. 16.

Meanwhile, upon receiving Allen's EEOC charge in March 2013, the City investigated the EEOC charge. On March 28, 2013, Ray met with Allen and told Allen that he would need to submit accommodation paperwork from his doctor in order to continue to work as accommodated in light of Allen's sworn statement in his EEOC charge that there was no accommodation that would allow Allen to perform the essential functions of the Water Meter Mechanic job. Ray then gave Allen accommodation paperwork for his physician to review and complete and asked Allen to return the accommodation paperwork by April 10, 2013.

Allen did not give the accommodation paperwork to Dr. Speer or any other doctor. Rather, Allen gave the accommodation paperwork to his attorney. Moreover, neither Allen nor his attorney responded to the City's request for accommodation information in the March 28, 2013 documents.

23

See Allen Dep. 84–88, 90–93, 120–23, 144–48. Instead, on April 9, 2013, Allen's attorney submitted the Workers' Compensation Medical Status Questionnaire form dated January 3, 2013, and signed by Dr. Speer. See id. 89–93. On the form, in response to the question, "At this time, given the patient's history or condition, is the patient able to return to his/her job as provided in the attached job description," Dr. Speer checked "NO." City Dep. Ex. 8. Attached to the form was a two-page job description for the Water Meter Mechanic position, and on page two someone circled the words "100 pounds" in a sentence stating that "[t]he employee must frequently lift and or move up to 100 pounds." Id. Allen admits that the form and the paperwork that his attorney submitted on April 9, 2013, did not describe the nature, severity, and duration of Allen's impairment, the activity or activities that the impairment limited, or the extent to which the impairment limited Allen's abilities to perform any activity or activities. See Allen Dep. 90–93; cf. City Dep. Ex. 8. Likewise, Allen admits that the form and paperwork that his attorney submitted on April 9, 2013, did not respond to the City's March 28, 2013 request for accommodation information and did not request an accommodation. Allen Dep. 90–93.

On April 10, 2013, Ray asked to meet with Allen to discuss his response of April 9, 2013, but Allen initially refused to meet without his lawyer present. See Ray Decl. ¶ 20; City Dep. Ex. 10. On April 11, 2013, Ray emailed Allen about the need to meet, explained the purpose of the meeting, and attached accommodation paperwork that the City was asking Allen to complete. Ray also told Allen in the email: "Unless you confirm in writing that you are able to perform your job with the accommodations we have made for you over the last few months, then you are going to have to take leave effective immediately until the attached medical forms are completed and returned." City Dep. Ex. 10.

On April 11, 2013, Ray, Allen, and Allen's supervisor Holloway met. At the meeting, Ray explained that Allen's response (through counsel) of April 9, 2013, stated that Allen could not return to work as a Water Meter Mechanic, but did not state what he physically could do. See Ray Decl.

24

¶ 24; City Dep. Ex. 12, p. 5. Ray gave Allen another set of the accommodation paperwork that the City needed to receive from Allen's physician to complete the accommodation process. Ray again told Allen if he would confirm in writing that he medically could continue to work as accommodated from December 4, 2012, through April 10, 2013, then he did not have to take leave. Instead of providing that written conformation, Allen went on paid leave on April 11, 2013. Moreover, Allen never provided any responsive medical documentation or accommodation paperwork to the City before retiring in November 2013, despite the City's request for such accommodation information on April 11, 2013, July 16, 2013, and September 16, 2013.

Unbeknownst to the City until discovery in this case, on April 24, 2013, EEOC Investigator Johnnie Barrett provided an email update to Allen's attorney concerning the status of the EEOC investigation. See City Dep. Ex. 18 [D.E. 30] 75–76. In that update, Investigator Barrett told Allen's attorney that: (1) Allen had suffered no adverse action when he filed the EEOC charge, but Allen filed anyway on the advice of counsel; (2) the City had provided Allen an accommodation by allowing him to perform the duties of his previous job, even though his title changed to Water Meter Mechanic on December 4, 2012, with no loss in salary; (3) the City provided the accommodation until Allen submitted medical documentation of his disability and limitations needed to perform his duties; (4) the City had not yet received the requested medical documentation from Allen; (5) the EEOC also wanted to review Allen's medical records concerning Allen's ADA claim, but Allen told the EEOC that his attorney was going to ask for a Notice of Right to Sue and would not submit such medical documentation to the EEOC; (6) on March 28, 2013, the City again requested medical documentation from Allen to complete and return; (7) on April 9, 2013, Allen (through counsel) submitted a "Workers' Compensation Status Questionnaire" form to the City but did not submit the requested medical documentation that the City needed to analyze any accommodation; (8) Allen was on paid leave beginning on April 11, 2013, until the City received "the required information to determine if [Allen] falls under the ADA and what accommodation, if any can be provided that will

25

Case 5:13-cv-00522-D   Document 50   Filed 09/23/15   Page 25 of 30

allow him to perform the essential functions of his new job. To date, the [City] states that this information has not been received." See id. Investigator Barrett then wrote Allen's attorney and said:

Perhaps you can be of assistance [in] providing the required documents to the [City] and the Commission so that a determination can be made on the merits of this charge, and more importantly, get your client an accommodation that will allow him to perform the essential functions of his job.

Id. 76.

Unfortunately for Allen, Allen's attorney did not follow the reasonable and prudent request of EEOC Investigator Barrett. Cf. Abraham Lincoln, Notes for a Law Lecture (July 1, 1850) in 2 Collected Works of Abraham Lincoln 81 (2001) ("Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses, and a waste of time. As a peacemaker, the lawyer has a superior opportunity of being a good man. There will still be business enough."). Instead, on May 16, 2013, Allen's attorney obtained the Right to Sue Notice from the EEOC. See Allen Dep. 156–57; City Dep. Ex. 17 [D.E. 30] 73–74. On June 21, 2013, Allen filed suit in state court.

Even viewing the record in the light most favorable to Allen, Allen caused the interactive process to break down by failing to respond to the City's repeated, reasonable requests for needed medical documentation and a specific request for an accommodation. In opposition to this conclusion, Allen first argues that the City should have examined Allen's workers' compensation file and determined his physical limitations from the eight forms in Dr. Speer's file from 2000 to 2011 and the January 3, 2013 form signed by Dr. Speer. See Allen Mem. Opp'n. Sum. J. [D.E. 37] 11–13.

The court rejects Allen's argument. Even assuming that the City had access to the eight workers' compensation forms in Dr. Speer's file dating from 2000 to 2011, such access does not

26

mean that the City had to review such dated documentation and guess about Allen's current medical condition in 2013 and any proposed reasonable accommodation. See 29 C.F.R. § 1630.2(o)(3). A person's physiology, health, and physical limitations are dynamic. Indeed, Allen admits that he did not know in 2013 what physical limitations he had, but he believed that he could do some of the tasks listed on the two-page Water Meter Mechanic job description but not do all of the listed tasks. See Allen Dep. 168–69, 197–99, 210–12. Allen also admits that the January 3, 2013 form does not state what he physically could do. Id. 90–91. Having the City review non-current medical information from 2000 to 2011 and non-responsive medical information from January 2013 and guess at an accommodation in 2013 is not the open, interactive process that the ADA requires. Rather, the ADA interactive process contemplates an open exchange of current medical information from the employee's doctor and other information from the employee and employer about job duties in order to help the employer and employee (and doctor where appropriate) to determine the specific limitations of the disability and whether an employer can provide a reasonable accommodation under the ADA. See, e.g., Gordon v. Acosta Sales & Mktg., No. 15-50060, 2015 WL 4878434, at *3 (5th Cir. Aug. 14, 2015) (per curiam) (unpublished); Kohl's Dep't Stores, Inc., 774 F.3d at 132–34; Williams, 552 F. App'x at 922; Hoppe, 692 F.3d at 840–41; Griffin, 661 F.3d at 224–25; Agro Distribution, LLC, 555 F.3d at 471–72; Jackson, 414 F.3d at 813–14; Loulseged, 178 F.3d at 735–36; Ross, 159 F.3d at 1013–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1134–37; Cole v. Charlotte Mecklenburg Sch. Dist., No. 3:13-CV-57-DCK, 2014 WL 1343123, at *13–14 (W.D.N.C. Apr. 3, 2014) (unpublished). The City repeatedly attempted to engage in this interactive process with Allen, but Allen repeatedly and egregiously thwarted the accommodation process.

Next, Allen suggests that he was confused because the December 2012 four-page City checklist form that Ray provided to him, that Dr. Speer reviewed, and that Dr. Speer approved on December 18, 2012, stated that Allen would do "Light Work," but the four-page City checklist form that Ray provided Allen on March 28, 2013, stated that he would do "Very Heavy Work." See Allen

27

Dep. 81–84; compare City Dep. Ex. 3, with City Dep. Ex. 7. Again, however, instead of engaging in an open, interactive dialogue with the City to clarify this issue, Allen remained silent. The silence is baffling given that Ray told Allen on April 11, 2013, that if he confirmed in writing that he could perform his job with the accommodation provided to him from December 4, 2012, through April 10, 2013, then he could continue to work. See City Dep. Ex. 10. If Allen could not provide such written confirmation, then he needed to complete the accommodation paperwork that the City provided to him and to take paid leave pending completion of the accommodation paperwork and the accommodation process. Id. The ADA's interactive process required Allen to seek to clarify the issue about his specific job duties and physical limitations, but he remained silent. See, e.g., Gordon, 2015 WL 4878434, at *3; Kohl's Dep't Stores, Inc., 774 F.3d at 132–34; Williams, 552 F. App'x at 921–22; Hoppe, 692 F.3d at 840–41; Griffin, 661 F.3d at 224–25; Agro Distribution, LLC, 555 F.3d at 471–72; Jackson, 414 F.3d at 813–14; Loulseged, 178 F.3d at 734–40; Ross, 159 F.3d at 1013–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1134–37.

Finally, Allen argues that on April 12, 2013, he contacted Jane Hardy, an employee of the City's third-party workers' compensation carrier, to arrange an appointment with Dr. Speer. See Allen Dep. 122–31. Allen believed based on his own misunderstanding of workers' compensation law that he needed to contact Hardy to make an appointment with Dr. Speer. Id. According to Allen, Hardy told him that she would seek City approval for the appointment and get back in touch with him. See id. 129–30, 207–08. A few days later, Allen again spoke with Hardy. According to Allen, Hardy said she initially had not gotten approval for Allen to see Dr. Speer but would follow up again and for Allen to contact her if he did not hear back. See id., 129–30, 205–08. Allen did not hear back from Hardy. See id. 122–31, 205–08.

What did Allen then do? Nothing. See id. He could have, but did not, make an appointment directly with Dr. Speer or some other doctor. He could have, but did not, contact Ray (or have his lawyer contact the City attorney) and explain that Allen was confused about how to get an

28

appointment with Dr. Speer in order to provide the requested accommodation information and that Allen believed that the City could help. Instead of taking any of these reasonable steps, Allen did none of them, remained silent, did not complete the accommodation paperwork, and remained on leave until he retired. In so doing, Allen utterly failed to fulfill his duties under the interactive process. See, e.g., Gordon, 2015 WL 4878434, at *3; Kohl's Dep't Stores, Inc., 774 F.3d at 132–34; Williams, 552 F. App'x at 921–22; Hoppe, 692 F.3d at 840–41; Griffin, 661 F.3d at 224–25; Agro Distribution, LLC, 555 F.3d at 471–72; Jackson, 414 F.3d at 813–14; Loulseged, 178 F.3d at 734–40; Ross, 159 F.3d at 1013–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1134–37.

The ADA uniquely and importantly seeks to ensure employment opportunities for those with disabilities. Congress designed the ADA to require employers and employees to discuss openly and candidly issues of physical or mental limitations and to seek to devise reasonable accommodations. The process requires current and complete medical information and bilateral, good-faith communications. An employer's liability for failure to provide a reasonable accommodation ensues only where the employer bears responsibility for the breakdown in such communications. "But, where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow." Beck, 75 F.3d at 1137. Because Allen utterly failed in his duties under the ADA and never provided the City with adequate understanding of his precise physical limitations and what accommodations it could take in light of these limitations, the City "cannot be held liable for failure to make reasonable accommodations." Id. (quotations omitted); see, e.g., Gordon, 2015 WL 4878434, at *3; Kohl's Dep't Stores, Inc., 774 F.3d at 132–34; Williams, 552 F. App'x at 921–22; Hoppe, 692 F.3d at 840–41; Griffin, 661 F.3d at 224–25; Agro Distribution, LLC, 555 F.3d at 471–72; Jackson, 414 F.3d at 813–14; Loulseged, 178 F.3d at 734–40; Ross, 159 F.3d at 1013–15; Steffes, 144 F.3d at 1072–73.

29

III.

In sum, defendant's motion for summary judgment [D.E. 27] is GRANTED. Defendant may file its motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This **23** day of September 2015.

JAMES C. DEVER III
Chief United States District Judge